IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) TORRANCE GENE JACKSON,                )
                                          )
        Plaintiff,                        )
                                          )
vs.                                       )    Case No.   CIV-19-742-SLP
                                          )
(1) BOARD OF COUNTY COMMISSIONERS         )
OF THE COUNTY OF OKLAHOMA;                )
(2) P.D. TAYLOR, individually and in his  )
official capacity as Oklahoma County Sheriff; )
(3) JOHN DOES 1-10, individually and in their )
official capacity,                        )
        Defendants.                      )

**COMPLAINT**

Comes now plaintiff, Torrance Gene Jackson, and for his action against defendants, asserts the following:

Parties

1. Plaintiff Torrance Gene Jackson is an individual and resident of Oklahoma County.

2. Defendant Oklahoma County is sued in the name of the Board of County Commissioners of the County of Oklahoma (hereinafter Board), as mandated by 19 O.S. § 4. Defendant Board is a statutorily created municipality and, therefore, deemed a 'person' pursuant to *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 690 (1978). Defendant Board was the employer of the other defendants named herein at the time of the actions giving rise to this lawsuit.

3. Defendant P.D. Taylor was acting individually and in his official capacity as

Oklahoma County Sheriff, or as "county officer" as defined in 19 O.S. § 161(1), at the time of the actions giving rise to this lawsuit and was the employer or supervisor of defendant John Does 1-10, to include the unknown Sheriff's detention officers, deputies or jailers who harmed plaintiff. Defendant Taylor was at all times acting under color of state law and within the scope of his employment as an agent or employee of the Board and Oklahoma County.

4. Defendant John Does 1-10 were the Sheriff's detention officers, deputies or jailers who harmed plaintiff and were at all times acting under color of state law and within their scope of employment as agents or employees of the Board and Oklahoma County at the time of the actions giving rise to this lawsuit.

## Jurisdiction and Venue

5. Paragraphs 1-4 are incorporated herein by reference.

6. This court has original jurisdiction pursuant to 28 U.S.C. § 1331 of all civil actions arising under the Constitution and laws of the United States, to include claims brought under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the Constitution.

7. This court also has original jurisdiction pursuant to 28 U.S.C. § 1343 to seek redress for the deprivation, under color of any state law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution or by any Act of Congress providing for equal rights of citizens or of all persons within the United States or

for the protection of civil rights, to include claims brought under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the Constitution.

8.   The actions giving rise to the above-styled cause occurred in Oklahoma County.  In addition, at least one defendant resides in this judicial district.  Therefore, jurisdiction and venue are proper pursuant to 28 U.S.C. §§ 116(c) and 1391(b).

Factual Background

9.   Paragraphs 1-8 are incorporated herein by reference.

10.   On August 13, 2017, at approximately 12:36 A.M. Mr. Jackson was observed by Officer Kyle Neller of the Oklahoma City Police Department to be speeding and making an improper turn.  Officer Neller attempted to stop Mr. Jackson but Mr. Jackson sped away and tried to flee.  After a brief chase, Mr. Jackson wrecked his car and his vehicle came to a stop.

11.   Mr. Jackson exited the car.  By now, Officer Neller had been joined by Officer Ronnie Waugh.  When Mr. Jackson failed to comply with instructions from the officers, he was tased, immobilized and arrested without further incident for (1) suspicion of DUI – alcohol and (2) attempting to elude peace officers.

12.   At approximately 1:02 A.M. Officer Waugh transported Mr. Jackson to Integris Southwest Medical Center, 4401 South Western, Oklahoma City, Oklahoma 73109. Officer Waugh took Mr. Jackson to the hospital to have the taser electrodes removed and to have Mr. Jackson assessed and cleared from a medical standpoint before transporting him to jail.  Officer Neller arrived at the hospital shortly thereafter and noted that medical staff

successfully removed the electrodes and that Mr. Jackson "was evaluated by Dr. Brian Pratt . . . and cleared for jail."

13. At 1:46 A.M. Officer Waugh transported Mr. Jackson to the Oklahoma County Jail for booking, located at 201 North Shartel, Oklahoma City, Oklahoma 73102. Officer Neller followed in his own car but did not go inside the jail, choosing instead to remain in his car to complete paperwork associated with Mr. Jackson's probable cause affidavit.

14. After securing his weapons in the trunk of his car, Officer Waugh escorted Mr. Jackson inside the Oklahoma County Jail. Once inside the Detention Officer's search area, Officer Waugh informed the Detention Officer that he was going to walk back to the Lieutenant's office to pick-up his booking sheet.

15. When Officer Waugh returned to the Detention Officer's search area, he observed Mr. Jackson lying on the ground and heard him telling the Detention Officer that he could not feel his legs. Officer Waugh also heard Mr. Jackson accuse the Detention Officer of paralyzing him. When Officer Waugh asked the Detention Officer what had happened to Mr. Jackson, the Detention Officer replied that he "had to take him [Mr. Jackson] to the ground because [Mr. Jackson] refused to give them his shoes." Officer Waugh then observed a "bulge on the back of his [Mr. Jackson's] neck and knew something serious had happened."

16. Officer Waugh was then instructed by "one of the Detention Officers" that he "was responsible for calling EMSA and responsible for the prisoner." Officer Waugh replied that he "was not calling EMSA and was not responsible for the condition of my prisoner because

[Mr. Jackson] was just fine when he entered their facility." Officer Waugh also noted that he "told her she better call EMSA since their employee did this and I was going outside to call my supervisor and our watch commander."

17. Mr. Jackson had been handcuffed or restrained with his hands behind his back when the incident and resulting injury occurred in the Detention Officer's search area, all during the time Officer Waugh left to go retrieve his booking sheet.

18. EMSA and Oklahoma City Fire Department personnel arrived at approximately 2:45 A.M. and found Mr. Jackson lying supine on the floor "in the receiving area of the county jail." The history provided to EMSA personnel came from unnamed "jail employees" who reported that Mr. Jackson "had an altercation with one of the guards and they slammed him to the ground." Abrasions were noted on the left side of Mr. Jackson's face and forehead as well as an abrasion on his left shoulder.

19. In light of Mr. Jackson's precarious condition, and the fact that EMTs were unable to elicit feeling in his upper or lower extremities, Mr. Jackson's spine was immobilized and he was transported emergently to OU Medical Center.

20. Officer Waugh went to OU Medical Center to check on Mr. Jackson. Upon arrival, he "noticed the county jail had already assigned a deputy to the hospital with [Mr. Jackson]." When he was asked by hospital personnel what happened at the jail, Mr. Jackson stated that he was "being booked into jail, feet were kicked out from underneath him and taken to [the] floor."

21. Ultimately, orthopedic spine surgeon Timothy Puckett, M.D., evaluated Mr. Jackson and diagnosed him with a "C-6-7 bilateral facet fracture dislocation with complete quadriplegia." Cervical facet joints are on each side of the spine and connect the vertebrae. The facets help guide your spine when you move. The C-6-7 vertebrae are within the lower segment of the cervical spine.

22. Mr. Jackson has remained a quadriplegic since the incident. The identities of the Detention Officer or Officers who caused this injury, referenced herein as John Does 1-10, remain unknown and have been purposefully withheld by the Board and County Jail despite lawful Open Record Requests.

23. A video of the incident purportedly exists but it has also been withheld by the Board and County Jail despite lawful Open Record Requests.

24. This brutal and excessive assault to Mr. Jackson – who was either an arrestee or pretrial detainee subject to the protections of the Fourth and Fourteenth Amendments to the Constitution – was unreasonably committed under the circumstances and Mr. Jackson is entitled to redress pursuant to 42 U.S.C. § 1983.

Causes of Action

**Claim I – Excessive Use of Force**
**(Fourth and Fourteenth Amendments; 42 U.S.C. § 1983).**

25. Paragraphs 1-24 are incorporated herein by reference.

26. Defendant John Does 1-10 were at all times acting in their capacity as Detention

Officers, deputies or jailers for Oklahoma County, as named herein as the Board of County Commissioners of the County of Oklahoma, under color of statutes, ordinances, regulations, customs or usage of Oklahoma County or the Oklahoma County Sheriff's Office.

27. In so doing, John Does 1-10 unreasonably deprived Mr. Jackson of his right to be secure in his person in violation of the Fourth Amendment and unreasonably deprived Mr. Jackson of his right to due process in violation of the Fourteenth Amendment to the Constitution. Specifically, John Does 1-10 used excessive and unreasonable force against Mr. Jackson during the booking process at the Oklahoma County Jail. At a minimum, this occurred by the unreasonable decision to secure Mr. Jackson's compliance in removing his shoes by sweeping his legs and slamming his head into the floor, all while his hands were restrained behind his back. Discovery of the video of this incident will shed additional light on the objectively unreasonable and excessive nature of this decision by John Does 1-10.

28. Viewing this incident from the perspective of a reasonable detention officer placed in the same or substantially similar circumstance, in light of other less forceful and reasonable options to search a detainee or obtain his shoes, John Does 1-10 clearly acted in an objectively unreasonable manner. There is no indication that John Does 1-10 attempted any other option to secure Mr. Jackson's compliance or engaged in any form of de-escalation prior to sweeping his legs and slamming his head into the ground.

29. John Does 1-10 should know, and it was foreseeable through training, experience and common sense, that sweeping a person's legs and slamming his head into the ground with

the person's hands restrained is likely to cause significant injury, including injury to the head or cervical spine. Mr. Jackson was restrained and there was no immediate threat to the safety of John Does 1-10 or others that warranted the use of such excessive and objectively unreasonable force.

30. The actions by John Does 1-10 violated Mr. Jackson's rights under the Fourth and Fourteenth Amendments and Mr. Jackson is entitled to redress pursuant to 42 U.S.C. § 1983.

31. The actions of John Does 1-10 and the resulting harm to Mr. Jackson was a foreseeable consequence of their willful, intentional and malicious behavior. John Does 1-10 engaged in this behavior and violated Mr. Jackson's constitutional rights with reckless disregard and deliberate indifference.

32. The actions of John Does 1-10 were the direct and proximate cause of Mr. Jackson's quadriplegia and injuries, all of which is permanent.

### Claim II – Municipal Liability Against Board
### (42 U.S.C. § 1983).

33. Paragraphs 1-32 are incorporated herein by reference.

34. Defendant John Does 1-10 were at all times acting in their capacity as Detention Officers, deputies or jailers for Oklahoma County, as named herein as the Board of County Commissioners of the County of Oklahoma, under color of statutes, ordinances, regulations, customs or usage of Oklahoma County or the Oklahoma County Sheriff's Office.

35. The following, as will be developed during discovery, will show that the Board

(Oklahoma County), by and through the Oklahoma County Jail and Oklahoma County Sheriff's Office, engages in customs and practices that regularly violate standard procedures and policies for the operation of detention centers or jails and, specifically, the handling of detainees or inmates, including but not limited to: (1) detention officers, deputies and jailers using objectively unreasonable excessive force without proper warning or commands and allowing inadequate time for compliance; (2) detention officers, deputies and jailers using false, misleading or deceptive practices to conceal information when excessive force has been used in order to justify their actions; (3) detention officers, deputies and jailers using painful techniques or outright force against restrained detainees or inmates who pose no immediate or potential threat to jail staff or others; (4) failure to discipline detention officers, deputies and jailers who use unreasonable and excessive force; and (5) failure to discipline detention officers, deputies and jailers who utilize false, misleading or deceptive practices to conceal information when excessive force has been used in order to justify their actions.

36.     There is an affirmative link and direct causal connection between the listed acts and omissions involving the customs and practices of the Board (Oklahoma County), by and through the Oklahoma County Jail and Oklahoma County Sheriff's Office, and Mr. Jackson's injuries. These customs and practices are the direct cause of the constitutional violations and injuries that were inflicted upon Mr. Jackson.

37.     In addition, the Board (Oklahoma County), by and through the Oklahoma County Jail and Oklahoma County Sheriff's Office, failed to adequately train and supervise its detention

officers, including Jon Does 1-10; thereby, resulting in the deprivation of constitutional rights by detainees and inmates at the Oklahoma County Jail, to include Mr. Jackson. These employees or agents should have been adequately trained and supervised to ensure the preservation of the constitutional rights of detainees and inmates for whom they are responsible. Given Mr. Jackson's incident and many other incidents at the jail, the Board has clearly violated its burden to properly train and supervise jail personnel.

38. The failure to properly train and supervise jail personnel set the stage for what happened to Mr. Jackson. By allowing inappropriate practices and customs to occur, and by failing to adequately train and supervise detention officers, deputies and jailers in the practice of using reasonable force, the Board ensured that additional detainees or inmates would be harmed, and Mr. Jackson was the unfortunate recipient of the injuries flowing from these constitutional violations.

39. There is an affirmative link and direct causal connection between the Board's failure to ensure proper training and supervision, by and through the Oklahoma County Jail and Oklahoma County Sheriff's Office, and Mr. Jackson's injuries. These failures are the direct cause of the constitutional violations and injuries that were inflicted upon Mr. Jackson.

### Claim III – Supervisory Liability of Sheriff Taylor
### (42 U.S.C. § 1983).

40. Paragraphs 1-39 are incorporated herein by reference.

41. Sheriff Taylor breached a duty owed to Mr. Jackson, which was the proximate cause

of his injuries. Specifically, defendant Taylor personally, and in his official capacity, involved himself in the constitutional violations that were directed toward Mr. Jackson. He did so by creating or promoting the creation of flawed training and supervisory protocols, policies, customs or practices. Alternatively, he did so by tolerating pervasive constitutional violations by lower echelon employees, such that his actual or constructive knowledge of their inappropriate actions provided tacit approval of their violative protocols, policies, customs or practices, including but not limited to: (1) use of unreasonable excessive force; (2) use of false, misleading or deceptive practices to conceal information when excessive force has been used in order to justify their actions; (3) use of painful techniques or outright force against restrained detainees or inmates who pose no immediate or potential threat to jail staff or others; (4) tolerating detention officers, deputies and jailers who use unreasonable and excessive force; and (5) tolerating detention officers, deputies and jailers who utilize false, misleading or deceptive practices to conceal information when excessive force has been used in order to justify their actions.

42.   Sheriff Taylor exercised discretion and control over jail personnel who committed these acts, including John Does 1-10 who violated Mr. Jackson's rights and caused him injury. Despite many prior instances of constitutional violations by jail personnel, Sheriff Taylor failed to properly discipline and supervise those who engaged in inappropriate behavior, to include excessive force violations of the Fourth and Fourteenth Amendments. Rather, despite his actual or constructive knowledge of these practices, Sheriff Taylor

acquiesced in their continued use.

43. Sheriff Taylor had a duty to promulgate and implement a set of policies and protocols to ensure the adequate training and supervision of jail personnel in the use of force. He failed to do so despite repetitive actions at the jail that suggested appropriate training and supervision was not being provided or followed.

44. The failure to properly train and supervise jail personnel set the stage for what happened to Mr. Jackson. By allowing inappropriate practices and customs to occur, and by failing to adequately train and supervise detention officers, deputies and jailers in the practice of using reasonable force, Sheriff Taylor ensured that additional detainees or inmates would be harmed, and Mr. Jackson was the unfortunate recipient of the injuries flowing from these constitutional violations.

45. There is an affirmative link and direct causal connection between Sheriff Taylor's failure to ensure proper training and supervision and Mr. Jackson's injuries. These failures are the direct cause of the constitutional violations and injuries that were inflicted upon Mr. Jackson.

<u>Prayer for Relief</u>

46. Paragraphs 1-45 are incorporated herein by reference.

47. WHEREFORE, plaintiff prays for judgment against defendants for actual, compensatory and exemplary damages in excess of Seventy-Five Thousand Dollars ($75,000.00), together with interest, costs, a reasonable attorney's fee and any additional

relief that the court and jury deem appropriate.

Dated this 13th day of August 2019.

                                                  Respectfully submitted,

                                                  s/Geremy A. Rowland

                                                  _____
                                                  Geremy A. Rowland     OBA No. 18822
                                                  Medley & Rowland
                                                  500 North Walker, Suite E200
                                                  Oklahoma City, OK 73102
                                                  405/606-4411
                                                  405/606-4410 (fax)
                                                  geremy@medleyrowland.com

**Attorney's Lien Claimed**          Attorney for Plaintiff,
**Jury Trial Requested**              Torrance Gene Jackson